No. 27,600.

KENNETH M. MARTIN, *Appellant*, v. THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, *Appellee*.

(263 Pac. 1055.)

SYLLABUS BY THE COURT.

1. REFORMATION OF INSTRUMENTS—*Sufficiency of Evidence*. In an action to reform insurance policies and to recover thereon as reformed, the evidence considered and held not sufficient to warrant a reformation of the policies.

2. ACCIDENT INSURANCE—*Construction of Policy*. And further, the proceedings considered and held there was no liability on the part of the defendant, and there could be no recovery under the terms of the policies unless reformed.

Appeal from Shawnee district court, division No. 1; JAMES A. McCLURE, judge. Opinion filed February 11, 1928. Affirmed.

*A. M. Harvey, Randall C. Harvey, Frank E. Miller, Leonard S. Ferry, A. E. Crane, B. F. Messick* and *A. H. Crane*, all of Topeka, for the appellant.

*Robert Stone, George T. McDermott, Robert L. Webb* and *Beryl R. Johnson*, all of Topeka, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The action was one to reform two contracts of insurance and to recover thereon as reformed. Defendant prevailed and plaintiff appeals.

---

Accident Insurance, 1 C. J. p. 409 n. 70. Reformation of Instruments, 34 Cyc. p. 984 n. 34.

·The plaintiff, who was a resident of Topeka, twenty-five years old at the time of taking out the insurance in question, was engaged with his father in the business of truck driving and the building of houses. He was also an athlete, playing some professional baseball. In March, 1925, he went on a trip to Paris, Tex., for the purpose of spring training with the Okmulgee, Okla., baseball team. During the time he was there he had a severe breakdown in health. His condition was not satisfactory, and he returned to Topeka, arriving March 22. Upon his arrival and failure to reach the family physician, Dr. James G. Stewart was called and examined him. He was found to be suffering with a heart leak, "mitral regurgitation," signifying a leak of the mitral valve. He stated that he had been trying out with the baseball team at Paris, Tex.; had gone there where it was hot; pitched six innings; that the severity of the exercise and the heat made him sick at his stomach; that the incident had occurred several days previous. The application for insurance was signed March 24, and on the next day, March 25, plaintiff was examined by defendant's physician, Doctor Alexander. The medical examiner found no indications of disease of the heart and reported plaintiff as a first-class risk. Policies were written bearing date of April 1, 1925, being actually delivered May 5, 1925. A payment of six dollars was made at the time the application was signed and the balance of the first quarterly premium paid May 5. On June 13, 1925, the plaintiff filed a proof of claim with defendant in which he claimed total and permanent disability on account of leakage of the heart, arising from an injury claimed to have been sustained by him in running a race at Washburn College, Topeka, March 26, the day after his medical examination. After the filing of his proof of loss, and about July 1, 1925, defendant sent him its regular quarterly notice of premium due, and on July 31, plaintiff paid such quarterly premiums and was issued a regular receipt therefor. The premiums received were not returned. Plaintiff first brought suit upon the policies issued to recover total disability benefits. An answer was filed by defendants, after which plaintiff, on leave being granted, filed his amended petition praying for reformation of the policies and to recover upon them as reformed. Issues were joined, the case tried to the court, and judgment was rendered for defendant, holding plaintiff was not entitled to reformation of the policies, and that plaintiff could not recover on them unless reformed.

Plaintiff states that reformation of the policies was asked in two parts. First, to change the effective date on the policies from April 1, 1925, to March 24, 1925, and to make the monthly indemnity payable for any disability which prevented the assured from engaging in his usual occupation. He contends that D. F. Harmon, agent for the defendant company, in taking his application for the insurance, told him the policy would go into effect just as soon as he passed the doctor's examination, but that if he died that night (March 24, 1925) it would pay the death claim. That Harmon told him the next day that he had passed the examination and that his policies were in effect. Plaintiff's wife testified that Harmon stated that the receipt for the down payment of $6 showed that plaintiff was insured; also that Harmon said when the doctor passed plaintiff he would be insured.

Harmon testified he did not tell plaintiff that the policies would be in effect from the date of the signing of the application; that he told him the policies would be in force from the time he signed the application after he paid the full first premium, providing that he was accepted at the home office of the company after his medical examination, and that he was so accepted; that when the application was signed he explained what the contract was and gave plaintiff the rates on it; that the rates were satisfactory, and when the application was completed Harmon asked him for some money on it. He wanted to know how much. Harmon testified:

"I told him it was necessary that I collect $6. It was covering the medical fee, provided the policy came down as he asked for it and he refused to accept the policy. I did not tell him at that time or at any other time that the policy would be in force and effect from the date of the signing of the application unless the full first premium was paid at that time, or that if he died that night the company would pay it. I told him that if he would pay the full first premium after he was examined and the company had accepted his application prior to the time the policy came down, the policy would be in force. I told him I was selling a life insurance policy with disability income for any disability that would be total and permanent from any cause. I never referred to any accident policy whatsoever. I was not authorized to solicit a health and accident policy."

From which it is noted that Harmon's testimony was in direct conflict with that of the plaintiff. The court concluded Harmon's version was correct. In a memorandum opinion the court stated:

"The plaintiff relies upon two conversations with D. F. Harmon, the agent; the first was in February, 1925, and the other was on March 24, 1925. Both

Martin v. Prudential Ins. Co.

conversations were the same, according to the plaintiff's testimony. Kenneth Martin, his wife Alice Martin, and his father, testified as to the February conversation on the part of the plaintiff, and Kenneth Martin and his wife testified as to what was said on March 24. The agent, Harmon, denies the statements made by the plaintiff, and states that he told them that this policy was a life policy, with disability benefits. The plaintiff claims that he represented it covered accident, sickness, death and disability, and that if he died that same night that he applied for the policy that he would get his money, because he was acting in good faith. If he was passed by the medical examiner, the policy would date from the date of the application. March 24 is when the application was signed."

Continuing, the court in substance said:

"Before March 22, the plaintiff was in Paris, Tex. He was a professional ball player. . . . He was down at Paris, Tex., working out. The evidence shows that he had pitched six innings, and then had a fainting spell and collapsed on the ball field. He was taken to the hotel and a doctor called and prescribed digitalis, which he procured; this was about the 18th or 19th of March. He left Paris, Tex., and came back to Topeka, his home. He states that the reason why he left there was that the food at the restaurant did not agree with him, and that he made arrangement with the manager of the team that he could work out with the Washburn College baseball team and report later. He brought the bottle of medicine back with him. He arrived here on Sunday, March 22. Shortly after his arrival his father attempted to call Doctor Crabb over the telephone but was unable to reach him, and then secured Dr. James Stewart, who examined him and found that he had heart trouble and heart murmurs, and thought that digitalis would help him. This was on the 22d of March, and he ordered him to report to him for further examination later. . . . When the plaintiff signed his application for insurance, or rather, when he filled out the questions and answers on the 25th day of March, the examination shows that the last time he was examined by a doctor was in 1924 for a cold. . . . He sent in a proof of disability sometime in June, 1925, and the father of the plaintiff procured from Doctor Stewart an attending physician's statement, and this was mailed to the company. In this statement the question was asked, 'How long have you been attending the patient?' The answers was, 'Since March 27, 1925.' Doctor Stewart took the stand and testified that the statement had been changed; that the original date that he wrote thereon was April 5, 1925, but upon an examination of his records he found that was not correct, and that he corrected the date to March 22, which was the date the plaintiff returned from Texas, on Sunday afternoon. It now bears the date of March 27. Doctor Stewart testified positively that the date had been changed. Photostatic copies and enlargements have been offered and there is no question but what the date has been changed by some one. The evidence does not disclose who. According to the evidence, it was changed after Doctor Stewart had given it to J. S. Martin, the father of the plaintiff. . . . I am inclined to think, however, that the trouble he had in

Texas bore directly upon his condition on March 26. He collapsed down there and had this heart trouble, probably strained his heart. The digitalis quieted it at the time he was examined by Doctor Alexander, and the murmur in his heart was not ascertained. Doctor Stewart was treating him for the very same thing during this period, and Doctor Stewart testified that by reason of this medicine it would quiet his heart so that the murmur was not readily discernible. I think the exertion upon March 26 while on the Washburn campus aggravated an already existing condition. There is no doubt but what there is a disability there, but I doubt if the court would be justified in granting a reformation. . . . Under all the evidence, the court holds it would not be justified in reforming the contract, and under the contract of insurance, unless it is reformed, judgment must necessarily be entered for the defendant."

The defendant did not seek to set aside the policies, but denied liability thereunder. Applications for the policies provided:

"I further agree that the policy herein applied for shall be accepted subject to the privileges and provisions therein contained, and that unless the full first premium is paid by me at the time of making this application, the policy shall not take effect until issued by the company and received by me and the full first premium thereon is paid."

The full first premium was not paid until about May 6, at the time of delivery of the policies. The policies contained this provision:

"If the insured shall become totally and permanently disabled, . . . and if such disability shall occur at any time after the payment of the first premium on this policy," etc.

Plaintiff's disability occurred before and not after payment of the first premium. Therefore, plaintiff's claim was expressly outside the terms of the policy, from which it necessarily follows that defendant was not liable.

The plaintiff insistently argues that the defendant waived its right to avoid the policies and misrepresentations in securing them and is, therefore, liable. The contention cannot be sustained. While acceptance of the premiums by the defendant was a waiver of its right to defend under the terms of the policies, such waiver did not extend to defendant's right to object to reformation of the policies. The defendant by its waiver became and is liable for any disability arising under the terms of the policies after they became effective; but the disability complained of, the disability under consideration, occurred before and not after payment of the premiums; before and not after the policies became effective. It is true that the plaintiff offered testimony showing that the agent of the defendant stated that the policies would be effective at once or from date of applica-

Leach v. Metropolitan Life Ins. Co.

tion; but as heretofore stated, defendant denied this, and on the question of fact the court found for the defendant. It concluded from the evidence, and we think properly, that the plaintiff was not entitled to reformation of the policies, and without reformation there could be no recovery.

The judgment is affirmed.

HARVEY, J., not sitting.